JACOB L. GORDER, Respondent, v. LINCOLN NATIONAL LIFE INSURANCE COMPANY, a Corporation, Appellant.

(180 N. W. 514.)

Insurance — war clause limiting liability applies only to death in consequence of military or naval service.

Under the war clause in an insurance policy, the insured was required to obtain permission from the company to engage in military or naval service in time of war and to pay an extra premium. In the event of his failure to do so, it was stipulated that in case of the death of the insured in consequence of such service, the liability of the company should not be greater than the legal reserve on the policy. Without obtaining the permit, the insured entered the military service and died of pneumonia about seven days after debarkation at Liverpool, England. It is held:

1. The clause above referred to does not limit the liability of the company except where death occurs *in consequence of* military or naval service.

Insurance — insurer has burden of establishing facts upon which limitation of liability by war clause depends.

2. Where an insurance company relies upon a provision in the policy limiting its liability to less than the amount of the insurance, it has the burden of establishing the facts upon which the limited liability depends.

Insurance — whether insured died in consequence of military service within war clause held a question of fact.

3. Whether or not the death of the insured in a particular case was in consequence of the military service within the above war clause is a question of fact to be determined upon all of the evidence of the circumstances surrounding the insured at the time of his death.

---

NOTE.—For authorities discussing the question of validity, construction, and effect of provisions in life or accident policy in relation to military service, see notes in 4 A.L.R. 848; 7 A.L.R. 382; and 11 A.L.R. 1103.

Insurance — statistics alone will not support a holding that insured died in consequence of military service.

4. Where a death is occasioned by a disease which was epidemic at the time among both the civilian and the military population, the court cannot find from statistics alone, which apparently show greater mortality in the army as a whole than among the civil population, that the insured died in consequence of military service.

Insurance — burden of showing that death of insured resulted from military service held not sustained.

5. The burden resting upon the defendant to establish that death resulted from military service is not sustained where no evidence is introduced showing sanitary conditions in the various camps in which the insured was stationed and upon the army transport. upon which he sailed, nor in the military unit to which he was attached.

Opinion filed December 6, 1920.

Appeal from the district court of Bottineau County, *A. G. Burr,* J. Affirmed.

*Pierce; Tenneson & Cupler,* for appellant.

On the question of the proof that the insured came to his death while subjected to the hazard of naval service, it is clear that such is not the case. He was in an inland city, and not subject to any risks not common to civilians with whom he was constantly associated. Myli v. American L. Ins. Co. 175 N. W. 631; Kelly v. Fidelity Mut. L. Ins. Co. 172 N. W. 153.

If the terms of the contract be clear, and not fairly susceptible of two constructions, an ambiguity cannot be assumed, and the plain intention of the parties nullified by construction. Hormel & Co. v. American Bonding Co. 128 N. W. 14, 33 L.R.A.(N.S.) 513.

*W. H. Adams,* for respondent.

BIRDZELL, J. This is an action to recover the face amount of a life insurance policy. By stipulation it was tried before the district court of Bottineau county without a jury and a judgment was rendered for the full amount of the policy, interest, and costs, amounting in all to $2,179.67. The policy was issued on March 31, 1917, to Arthur Norman Gorder, age twenty-two years. The beneficiary was Jacob L. Gorder,

his father, the plaintiff in this action.  On June 14, 1918, the insured entered the military service of the United States under the Selective Service Law.  He was stationed in various training camps and cantonments prior to his embarkation for overseas duty.  At the time of embarkation he was a member of Battery F, 125th Field Artillery, and sailed with this unit on September 24, 1918, on the army transport "Saxon."  He is reported to have been transferred on October 7, 1918, to the base hospital at the port of debarkation, Liverpool, England, where he died on October 14, 1918, of pneumonia.

The defense relied upon by the appellant arises under the provision of the policy which was stated under the heading "Conditions as to Residence, Travel and Occupation."  The provision reads as follows:

"This policy is free from restrictions as to residence, travel and occupation after one year from date of issue, except military or naval service in time of war, for which permission must be obtained from the company and an extra premium, at the established rate, shall be paid.  In case of death of the insured in consequence of such service and without the company's permit, the liability of the company hereunder shall be for an amount not greater than the legal reserve on this policy."

The insured had paid the annual premium stipulated in the policy of $48.76 but he had not paid the extra premium which would cover the risk of military service fixed by the actuaries at $100 per thousand, or $200 per annum on this policy.  Nor had he obtained permission from the company as required by the clause above quoted.  The trial court found that the death of the insured was not in consequence of his military service.

It is contended that the insured had subjected himself to greater hazard by becoming a member of the military forces and by submitting to conditions of life prevailing in military camps and upon transports, thereby being subjected to contagious diseases prevalent in armies.  It is stated that such diseases as typhoid, measles and influenza are more prevalent in the army than in civil life and that even during times of warfare a greater number of soldiers have died from contagious diseases than were killed in actual combat.  The appellant argues from this that a death from one of these diseases while in military service is necessarily a death resulting from the service just as

much as though it had resulted from a wound from an enemy bullet. Reading the clause in question in the light of such facts, it is contended that it is not ambiguous, and that its purpose is to stipulate against all increase of risk due to military service.

We cannot adopt this construction of the provision for the reason that it is expressly stated therein what the effect of the failure to obtain the permit and pay the extra premium shall be. The provision is in two parts; one part provides for the payment of an added premium to cover all risk incident to military service, and the other stipulates for a limited liability where the insured, without contracting for the added risk, dies "in consequence of such service." The limitation is not to be construed liberally to reduce liability. There is a vast difference between a death *in* the active military service (Miller v. Illinois Bankers' Life Asso. 138 Ark. 442, 7 A.L.R. 378, 212 S. W. 310; Reid v. American Nat. Assur. Co. 204 Mo. App. 643, 218 S. W. 957; Ruddock v. Detroit L. Ins. Co. 209 Mich. 638, 177 N. W. 242) and a death *in consequence of such service*. Malone v. State L. Ins. Co. 202 Mo. App. 499, 213 S. W. 877; Kelly v. Fidelity Mut. L. Ins. Co. 169 Wis. 274, 4 A.L.R. 845, 172 N. W. 152; Benham v. American Cent. L. Ins. Co. 140 Ark. 612, 217 S. W. 462; Nutt v. Security L. Ins. Co. 142 Ark. 29, 218 S. W. 675. A further reason why the limitation should only operate to reduce liability in the instances where the death occurred *in consequence of* military service is that the normal premiums continue to be payable. These premiums are presumably calculated on the basis of average mortality in civil life. To give to this war clause the construction for which the appellant contends would be to discriminate in this respect against all who entered the military service. It is well known that the ravages of influenza-pneumonia resulted in many thousands of deaths among those in civil life, and to hold that the insurance is not applicable where a soldier dies from the same cause would be to exempt for a hazard that would have been insured against had the soldier remained in civil life. With respect to soldiers, therefore, it would place the insurance company upon a better footing than it occupied with respect to civilians generally.

The provision differs materially from the one before this court in the case of Myli v. American L. Ins. Co. 43 N. D. 495, 11 A.L.R. 1097, 175 N. W. 631. In the policy there considered it was stipulated:

"If, within five years from date hereof, the death of the insured shall occur while engaged in military or naval service in time of war without having previously obtained from the company a permit therefor, the company's liability shall be limited to the cash premiums paid hereon for the three years from date of issuance and thereafter to the legal reserve on this policy," etc.

Had that provision stood alone, it would have been extremely doubtful whether the beneficiary could have recovered insurance where the insured had been inducted into the active military or naval service. Malone v. State L. Ins. Co. 202 Mo. App. 499, 213 S. W. 877; Miller v. Illinois Bankers' Life Asso. supra; Reid v. American Nat. Assur. Co. 204 Mo. App. 643, 218 S. W. 957; Ruddock v. Detroit L. Ins. Co. 209 Mich. 638, 177 N. W. 242; Nutt v. Security L. Ins. Co. supra. Language could have been employed which would have rendered more clear the intention to make the status of the insured alone the condition upon which the limited liability would attach. But the other provisions of the policy so clearly provided for double indemnity and disability insurance, except for death or injuries *resulting from* military or naval service, that it was plain status alone was not the condition of the limited liability. Under the facts in that case it was evident that death did not result from the service; also that the insured did not die surrounded by any hazards not common to civilians in equal degree. So, adopting the most favorable construction contended for by the beneficiary (making the character of the service the test), the beneficiary was clearly entitled to recover. He, of course, would have been equally entitled to recover had he contended that it was not shown that death in fact *resulted from* the service.

In the instant case, death occurred while the insured was in the active military service and is attributable to a cause which resulted in many deaths both in civilian and army life. It has been held that a death from such cause cannot be said to have been a death resulting from military service. The supreme court of Arkansas, in the case of Benham v. American Cent. L. Ins. Co. 140 Ark. 612, 217 S. W. 463, said:

"In the case at bar the insured died from influenza, and the record shows that this disease was prevalent throughout the United States, and that soldiers and civilians alike contracted it and died from it.

The death of the insured, then, was in no sense caused by performing any military service, or in consequence of being engaged in military service."

We do not hold that a death from influenza may not, under certain circumstances, be shown to have been in consequence of military service within a war clause such as the one in question. See 18 Mich. L. Rev. 686. We are satisfied, however, that the company has not shown the death in the instant case to have been in consequence of such service.

It is elementary that the burden of establishing the facts which relieve an insurance company from liability for the face of the policy rests upon the defendant. 25 Cyc. 925–930; Malone v. State L. Ins. Co. supra. It is frequently held under clauses somewhat analogous, such as those limiting liability where the death of the insured is caused by the use of intoxicating drink or occurs in consequence of the violation of the criminal law, that the burden is upon the company to establish the fact that the death was the proximate result of the cause and thus to bring the case within the limitation. Cluff v. Mutual Ben. L. Ins. Co. 13 Allen, 308, and a case arising out of the same facts. Bradley v. Mutual Ben. L. Ins. Co. 45 N. Y. 422, 6 Am. Rep. 115; Mutual L. Ins. Co. v. Stibbe, 46 Md. 302; Kerr v. Minnesota Mut. Ben. Asso. 39 Minn. 174, 12 Am. St. Rep. 631, 39 N. W. 312. See also Fellers v. Modern Woodmen, 182 Iowa, 99, 165 N. W. 584.

We have no evidence bearing upon the sanitary condition of the camps in which the insured had been stationed prior to his death, nor with respect to the army transport "Saxon," upon which he sailed. Sanitary conditions varied greatly upon different transports. See The Military Surgeon, October, 1919, p. 399. If any presumption would arise regarding the sanitary conditions surrounding him prior to embarkation, it would be that they were good; for it is not to be presumed that the War Department would designate for overseas duty units that were in poor physical condition or that were likely to become incapacitated prior to participation at the front. Neither is there any evidence of the extent of the prevalence of influenza or pneumonia in the unit to which the insured was attached. Dr. Alyen of Fargo, who was in the medical corps of the United States Army

practically throughout the war, and who had considerable experience in 1918 at ports of embarkation, debarkation, and upon transports, having made four trips upon three different transports—none, however, upon the transport "Saxon"—testified by deposition.   He testified that the ships were crowded; that the men were obliged to sleep in quarters with little or no ventilation; that conditions were such as to increase the risks of transmission of communicable diseases to the highest point.   In stating his opinion as to the cause of the spread of the epidemic of influenza-pneumonia among the troops, he ascribed it to close contact, constant movement of the troops, age of the individual, rapid movement of the troops, climatic conditions, and the short period of organization after reaching debarkation camps.   In addition to this testimony the appellant relies upon statistics showing a much higher mortality rate for influenza-pneumonia in the army than is shown by statistics covering those in civil life.   Some statistics offered would seem to show that there were about six deaths in the army from this cause to one in civil life among a similar number of people, and that the disease was much more prevalent in the army than in civil life.   These statistics are admitted to be very unreliable; for, as is remarked in the report of the state board of health for the biennial period ending June 30, 1920, "Case reports were most inaccurate and thousands never saw a physician," whereas, in the army every man was under constant observation for pathological symptoms, and no case of disease would be likely to be overlooked.   Furthermore, the age of susceptibility to the particular disease in question is greatest and the mortality highest among those of military age, and of these it has been observed that it bore heaviest upon the most vigorous. Therapeutics, Preventive Medicine, Fantus and Evans, vol. 6, 1919, 323; Annual Report of Public Health Service (U. S. Treasury) for 1919, page 179.   The removal of so large a number of vigorous persons of this age from civil life would naturally have a tendency both to lessen the mortality rate for civil life and to accelerate it for military life.   There is a woeful lack of accurate information concerning the ravages among the civil population of the pandemic of influenza-pneumonia.   The United States Public Health Service has estimated the number of deaths at 350,000; the New York Life Insurance Company has placed the number at 460,000, or about 30 per cent greater;

and Major Soper of the sanitary corps of the United States Army, who has given special consideration to the subject, says it is doubtful if this larger estimate is great enough. The Annual Report of the Public Health Service (United States Treasury) for 1919 puts the number at over 500,000 (page 178).

The outstanding fact in this case is that the hazard to the lives of both the military and civil population was increased several fold by the prevalence of the pandemic of influenza-pneumonia. Statistical data thus far compiled show wide variation of mortality in different sections of the country and in different army camps. Both soldiers and civilians suffered from a common disease, whereas the high death rates due to diseases in the armies assembled in former wars were occasioned by diseases more peculiar to military life. Diseases such as typhoid, before the employment of modern preventive methods, would rage in the army because of the peculiar facilities for acquiring it, whereas it would continue to affect only the average number in civil life. Now it is more rare in the army than in civil life, due to efficient preventive measures.

However the policy in question might be construed in reference to diseases that are more peculiarly prevalent in army camps than in civil life, so that a death from such a disease might be regarded as a death in consequence of such service, we are of the opinion that on the record in this case we cannot say that the death of the insured was in consequence of such service. It is our opinion, further, that under the language of the provision in question each individual case is to be determined upon its own facts. For the foregoing reasons the judgment appealed from is affirmed.

NUESSLE, BRONSON, and ROBINSON, JJ., concur.

GRACE, J. I concur in the result.

Mr. Chief Justice CHRISTIANSON, being disqualified, did not participate; Hon. W. L. NUESSLE, Judge of the Fourth Judicial District, sitting in his stead.