**SOVEREIGN CAMP, W. O. W., v. TODD et al.**
**(No. 6804.)**

(Court of Civil Appeals of Texas. Austin.
April 14, 1926.)

1. **Insurance** ⊝⟹755(2)—**Local clerk of fraternal lodge, without authority under policy or otherwise to receive notice of beneficiary's enlistment in army or to collect extra war risk assessment, cannot bind lodge by waiver or estoppel.**

Where local clerk of fraternal insurance lodge was not shown to have ever received authority from Sovereign Clerk to receive notice of insured's enlistment in army or to collect extra war risk assessments, both of which were required by the policy, to be sent to Sovereign Clerk, acts of local clerk in refusing tender of extra assessment and notice could not bind lodge or Soverign Clerk, either by waiver or estoppel, to deny receipt of notice and assessment.

2. **Insurance** ⊝⟹755(2)—**Fraternal insurance society may limit power of agents to waive conditions of certificate, constitution, or laws of society (Rev. St. 1925, art. 4846).**

Under Rev. St. 1925, art. 4846, fraternal insurance society has authority to limit power of agents or officers to waive any conditions of insurance certificate, constitution, or laws of society.

3. **Insurance** ⊝⟹689—**Statute empowering fraternal benefit society to limit authority of agents to waive laws in constitution held valid (Rev. St. 1925, art. 4846).**

Rev. St. 1925, art. 4846, empowering fraternal benefit society to limit authority of agents or officers to waive provisions of laws and constitution of society, held valid.

Hildebrand, Special Chief Justice, dissenting.

Appeal from District Court, Comanche County; Mark McGee, Special Judge.

. Suit by Laura Todd and others against the Sovereign Camp, Woodmen of the World. Judgment for plaintiffs, and defendant appeals. Reformed in part, and in part reversed and rendered.

D. E. Bradshaw, of Omaha, Neb., and Bradley, Braley & Bradley, of Fort Worth, for appellant.

Edgar Nabors, of Hamilton, and Smith & Woodruff, of Comanche, for appellees.

---

CRITZ, Special Justice. This is a suit instituted in the district court of Comanche county, Tex., by Laura Todd and her husband against the Sovereign Camp, Woodmen of the World, on an insurance policy dated the 11th day of December, 1917, issued by the defendant, a corporation, on the life of Hyman B. Todd, in the sum of $2,000. This plaintiff, Laura Todd, was the mother of the insured and the beneficiary named in said policy. The policy contained a provision that if death occurred within the first year the beneficiary should receive one-half the face of the policy, if during the second year, $1,500, and the face of the policy if death occurred after the second year. The evidence is undisputed that the insured died during the first year.

Hon. J. R. McClellan, judge of the Fifty-Second judicial district, having disqualified himself from trying the case by reason of his membership in the appellant society, upon agreement of the parties the case was tried before Hon. Mark McGee, as special judge. The case was tried without a jury, and on the 2d day of December, 1922, the court rendered judgment in favor of the plaintiffs for the sum of $1,242.33, with interest at 6 per cent. from that date. The policy contained the following provision written on the back thereof:

"In the event the holder of this certificate should die while serving in any branch of the United States Army and Navy either as an officer or enlisted man, outside the boundaries of the United States of America, the amount due under this certificate shall be such proportion of the amount thereof as the period he has lived since becoming a member bears to his expectancy of life at the time of becoming such member, determined by the National Fraternal Table of Mortality: Provided, that should the holder of this certificate so desire, he may within thirty (30) days after entering the service in any branch of the United States Army or Navy, as an officer or enlisted man, notify the Sovereign Clerk at the home office of the society, Omaha, Nebraska, United States of America, that he has entered such service of the United States of America and pay in advance to the Sovereign Clerk, for the society, the sum of $37.50 (thirty-seven and 50/100 dollars) per one thousand dollars insurance per annum in addition to the regular assessment prescribed by section 56 of the constitution and laws of the Sovereign Camp of the Woodmen of the World; and upon so doing at the death of the member or as soon thereafter as possible, the amount prescribed in this certificate shall be paid to his beneficiary or beneficiaries: Provided, further, that should any member of this society who has entered the service of the United States Army or Navy, either as an officer or enlisted man, pay the additional war risk of $37.50 per one thousand dollars per annum and die in the United States, without having served outside the boundaries of the United States of America, the total amount paid by him as war assessment shall be refunded to his beneficiary or beneficiaries."

The trial court filed his findings of fact and conclusions of law, which, in substance, found, among other things, that, at the time of his death, the insured was enlisted in the noncombatant branch of the military service of the United States, and had been in such service for more than 30 days prior to the date of his death, and, in this connection, it is undisputed that the insured died outside the boundaries of the United States and while serving in the noncombatant branch of the United States army in France.

It is the contention of the appellant that, it appearing from the pleadings and the evidence that the amount recoverable under the terms of the certificate of insurance was limited to a small proportion of its face value, in the event the insured died outside the boundaries of the United States, while in the military service of the United States, unless the member should within 30 days after his entry into such military service notify the Sovereign Clerk of the appellant society at its home office in Omaha, Neb., of his entrance and service, and pay to said sovereign clerk the sum of $37.50 per $1,000 of insurance per annum in addition to the regular assessment, and that the insured having died in France while in the military service of the United States, without having given such notice to the Sovereign Clerk and without having paid such additional assessment to the Sovereign Clerk, his beneficiary is only entitled to recover the small amount provided in the above quoted clause of said policy.

It is the contention of the appellees that the notice provided for in the above quoted clause was given the clerk at the local camp at Comanche, Tex., and tender of the additional assessment also provided for was made to said local clerk within the time provided for by the policy. The insured was a member of the local camp at Comanche, Tex. It is further the contention of the appellees that such local clerk refused said tender—that is, refused to accept the payment of said additional assessment. It is our opinion, and we so find, that the insured did make tender of said additional assessment to the local clerk of the Comanche camp, and that notice was given to said local clerk of the entrance of the insured into the military forces of the American army, and of his service in said army beyond seas and that such local clerk refused to receive such additional premium, and by his acts and conduct waived the payment of such additional premium, if he had the right or authority to do so. The appellee had pleaded that notice and tender was made to the local clerk, and pleaded waiver and estoppel.

The certificate of insurance made the basis of this suit also contained the following provision:

"No camp nor officer thereof, nor any officer, employee or agent of the Sovereign Camp has

authority to waive any of the conditions of this beneficiary certificate or of the constitution and laws of this society."

Section 69 of the constitution and laws of the appellant was introduced in evidence, and read as follows:

"(a) No officer, employee, or agent of the Sovereign Camp, or of any camp, has the power, right, or authority to waive any of the conditions upon which beneficiary certificates are issued, or to change, vary or waive any of the provisions of ·this constitution or the laws, nor shall any custom on the part of any camp or any number of camps, with or without the knowledge of any Sovereign officer, have the effect of so changing, modifying, waiving or foregoing such laws or requirements. Each and every beneficiary certificate is issued only upon the conditions stated in and subject to the constitution and laws, then in force thereafter enacted.

"(b) The constitution and laws of the Sovereign Camp of the Woodmen of the World now in force or which may hereafter be enacted, by-laws of the camp now in force, or which may be hereafter enacted, the application and certificate shall constitute a part of the beneficiary contract between this society and the member."

The trial court found as a matter of law that the clerk of the local camp at Comanche was the agent of the Sovereign Clerk of the defendant company, for the time covered from the date of the certificate to the death of the insured, and that as such agent he had authority to collect any and all dues and assessments of every kind and character from the membership of the local camp, including the extra assessment of $37.50 per $1,000 of insurance; and that notice to the local clerk was notice to the defendant company and to the Sovereign Camp. The trial court also found as a matter of law that the tender of payment of the extra assessment above alluded to to the local clerk was, in law, the tender of the assessment to the Sovereign Clerk of the Sovereign Camp, and that the defendant is estopped to rely upon the failure of the said Hyman B. Todd to give notice to the Sovereign Clerk, and to tender to the Sovereign Clerk directly the extra assessment in question.

[1] We have diligently searched the statement of facts for evidence to sustain these findings, and we are unable to find any evidence in the record that will sustain them. The local clerk is not shown to have ever received any authority from the Sovereign Clerk or Camp to receive this notice or to collect the extra war risk assessment, but, on the contrary, the local clerk seems to have been under the impression that the Sovereign Camp did not desire its collection. It is shown that he had collected for many years all other dues and assessments, but under the express provision of the policy this extra war risk assessment was payable to the head clerk at Omaha; Neb., and the notice should have been given to such head clerk. It is true that the local clerk does testify that he had such authority, but his statement is a pure conclusion and absolutely contradicted by the facts · and by the plain provisions of the policy.

[2] Authority for the provision of the constitution and by-laws of the order, and for the provision in the certificate of insurance quoted above, in so far as applies to the matters involved in this case, with reference to the power of agents, etc., to bind the main order by waiver, is found in our Revised Civil Statutes 1925, art. 4846 (old No. 4847), which reads as follows:

"The constitution and laws of the society may provide that no subordinate body nor any of its subordinate officers or members shall have the power or authority to waive any provision of the laws and constitution of the society, and the same shall be binding on the society and each and every member thereof and on all beneficiaries of members."

[3] The statute above quoted is, in our opinion, valid, and the appellant is such a society as comes directly under its provisions. It is true that there are cases which seem to limit the effect of this statute, but a careful reading of these cases will show that they merely hold that the general principles of the law of agency apply to these associations in like manner as to other associations and individuals, and that when the association delegated to a local body or officer some duty to be performed for the association, that such association is bound by the acts of the agent within the scope of the delegated duties. Calhoun v. Maccabees (Tex. Com. App.) 241· S. W. 101. See, also, the case of Sovereign Camp, W. O. W., v. Putnam (Tex. Civ. App.) 206 S. W. 970; and Sovereign Camp, W. O. W., v. Miller (Tex. Civ. App.) 220 S. W. 635.

The distinction to be drawn between this case and the Maccabees Case above referred to is that in the Maccabees Case payment and notice was expressly provided under the plain terms of the policy to be given to the local clerk, and thus the local clerk was made the agent of the order. In this case the clause in the policy is clear and unambiguous that both the notice and the payment shall be made to the Sovereign Clerk of the order at Omaha, Neb., its home office. In the Maccabees Case the local clerk had authority to receive the notice and collect the assessment; in this case the local clerk did not have authority to either receive the notice or collect the assessment.

Being of the opinion that the record shows affirmatively and conclusively that the local clerk was without authority to collect the extra war risk assessment, or to receive the notice provided for in the policy, made the basis of this suit, then the acts of the local clerk could not bind the Sovereign Camp or the Sovereign Clerk either by waiver or estoppel.

The identical question involved in this suit has heretofore been decided by this court in the case of Sovereign Camp, W. O. W., v. Jackson et al., 264 S. W. 289, opinion by Judge R. E. Cofer, special justice. We here cite that case with approval.

There is some little discrepancy as to the amount due to be paid under the construction we have given this policy in the light of the evidence and pleadings, but, as the Sovereign Camp offered to pay and has tendered $93.44, and as that amount will more than pay the amount due under the terms of the policy and the evidence, and as the facts in this case seem to have been fully developed, and no purpose could be attained by reversing and remanding this case; it is therefore ordered that the judgment of the district court be reformed so that the appellee, Mrs. Laura Todd, shall recover said sum of $93.44, with interest from this date at 6 per cent. per annum, and the judgment of the lower court is reversed and rendered as to the balance of the sum recovered by appellees in the district court. It is further ordered that appellees pay all costs of this appeal.

Reformed in part, and in part reversed and rendered.

BAUGH, J., concurs.

HILDEBRAND, Special Chief Justice (dissenting). This suit was instituted by Laura Todd and her husband against the Sovereign Camp of the Woodmen of the World on a policy of insurance dated the 11th day of December, 1917, executed by the defendant corporation on the life of Hyman B. Todd in the sum of $2,000. The plaintiff Laura Todd was the beneficiary of the policy. The policy contained a provision that if death occurred within the first year the beneficiary should recover one-half of the face of the policy, if during the second year the beneficiary should recover $1,500, and the face of the policy if death occurred after the second year. On the back of the policy there were certain conditions which were referred to and made a part of the policy. The fifth condition provided that:

"In the event the holder of this certificate shall die while serving in any branch of the United States army or navy, either as an officer or enlisted man outside of the boundaries of the United States of America, then the amount due under this certificate shall be such proportion of the amount thereof as the period he has lived since becoming a member bears to his expectancy of life at the time of becoming such a member, determined by the National Fraternal Congress Table of Mortality:

"Provided, that should the holder of this certificate so desire, he may within thirty days after entering the service of any branch of the United States army or navy as an officer or enlisted man, notify the Sovereign Clerk at the home office of the society, Omaha, Nebraska, United States of America, that he has entered such service of the United States of America and pay in advance to the Sovereign Clerk, for the society, the sum of $37.50 (thirty-seven and 50/100 dollars) per one thousand dollars insurance per annum in addition to the regular assessments prescribed by section 56 of the Constitution and the laws of the Sovereign Camp of the Woodmen of the World, and upon so doing at the death of the member or as soon thereafter as possible the amount prescribed in this certificate shall be paid to his beneficiaries or beneficiary.

"Provided, further, that should any member of this society who has entered the service of the United States army or navy, either as an officer or enlisted man, pay the additional war risk of $37.50 per one thousand dollars per annum and die in the United States, without having served outside the boundaries of the United States of America, the total amount paid by him as war assessments shall be refunded to his beneficiary or beneficiaries."

The Woodmen of the World is a corporation incorporated under the laws of Nebraska. It is made up of camps situated in the states of the Union. It has a permit to do business in Texas, and has established many camps in this state. The policy was sent by the Sovereign Commander to F. C. Findley, the clerk of camp No. 60 at Comanche, Tex. Mr. Findley delivered the policy to the insured on the 17th day of December, 1917, after the insured had made all payments required and been introduced as a member. Mr. Findley had been clerk of the camp at Comanche, Tex., since 1907, and a member of the Sovereign Camp since 1909. It seems that the camps of Texas send representatives to "head camp meetings in Texas," and at these meetings delegates are elected to the "Sovereign Head Camp." At the meetings of the "Sovereign Head Camp" officers of the corporation are elected by the delegates, by-laws are enacted or amended, and other business of the corporation transacted. As testified in this case, the camps are "an integral part of the corporation." It seems as though the corporation does not have a board of directors unless the delegates are considered as such. In Texas the stockholders of a corporation elect directors, and the directors formulate the by-laws, but these by-laws may be changed by a majority vote of the stockholders. Article 1155, Rev. Stats. 1911.

Where the law of a sister state is involved in a case pending in Texas, and the law of that state is not proven as a fact, it will be presumed to be the same as that of Texas. Tempel v. Dodge, 89 Tex. 69, 32 S. W. 514, 33 S. W. 222; Crosby v. Huston, 1 Tex. 203; James v. James, 81 Tex. 381, 16 S. W. 1087. Therefore Mr. Findley was either a director of the Sovereign Camp, Woodmen of the World, or occupied a position very similar to that of a director.

The insured joined the American army on the 25th day of March, 1918, and died in France on the 11th day of November, 1918.

Before Hyman B. Todd left Comanche, Tex., for Ft. Sam Houston at San Antonio, Tex., to join the army, he informed Mr. Findley that he had sufficient money on deposit in the Comanche National Bank and at his father's store to pay all dues and assessments that may be due and payable by him, and Mr. Findley promised to collect all assessments while Mr. Todd was in the army from one of these sources. Plaintiff did not contend that the insured had paid the extra assessment of $37.50 per $1,000 after he had entered the American army, but that an agent of the insured had on two occasions tendered the money to Mr. Findley, and the latter refused to accept it. Mr. Findley admitted that he refused to accept the money tendered, as he insisted that nothing was due by the insured, since Mr. Todd was in the "noncombatant department of the army.". There was no conflict in the testimony on this point. Mr. Findley and Mr. Ormsby testified to the above facts, and no one contradicted their testimony. The case was tried before the Hon. Mark McGee, who filed conclusions of law and fact. The seventh conclusion of fact was as follows:

"That within 30 day after entering the military service of the United States the said Hyman B. Todd personally and through his agent and representative notified the Sovereign Clerk of the Sovereign Camp of the Woodmen of the World, Omaha, Neb., through the agent and representative of the said Sovereign Clerk, to wit, S. C. Findley, that he had entered the military service of the United States, and the agent and representative of the said Hyman B. Todd did within said time tender to the said S. C. Findley, agent aforesaid, said sum of $37.50 per $1,000 of insurance per annum in addition to all other dues and assessments; and that the said S. C. Findley, agent and representative of the said Sovereign Clerk of the Sovereign Camp of the Woodmen of the World, declined to accept said sum of money tendered him."

The tenth conclusion was as follows:

"That S. C. Findley was the agent and representative of the Sovereign Clerk of the Sovereign Camp of the Woodmen of the World; that he had the power and authority to collect from the membership of the local camp No. 60 dues and assessments due the Sovereign Camp; that it had been a long-standing, universal, well-known, and general custom for the said Findley to collect dues and assessments from the members of the local camp at Comanche, Tex., for the Sovereign Clerk, and to remit the same to him, and for the purpose of collecting all dues, premiums, and assessments provided for by the terms of the certificate in question, that the said S. C. Findley was the agent of the Sovereign Camp and of the Sovereign Clerk."

If there is any testimony to support this finding, it is the duty of this court to affirm the decision of the lower court. In other words, if Mr. Findley was authorized to collect the $37.50 per $1,000 which should have been paid by Mr. Todd after he entered the American army, it goes without saying that a tender of the amount to Mr. Findley would be the same as if the amount had been paid to the clerk of the Sovereign Camp. We conclude from the testimony in this case that there is ample testimony to support the above findings of the trial court.

Mr. Findley testified that:

"The Sovereign Camp requires the local camp to collect assessments from various members and remit to the Sovereign Camp once a month either by check, post office money order, or by bank draft, and * * * the clerk of the local camp is merely the agent of the Sovereign Camp in that way. They have charge of the assessments—collection of the assessments from the members of the local camps. It is a part of their duty to send in those dues once a month. I have been performing that duty since 1907 for this camp, and still am. I collected all dues owed by Hyman B. Todd. I continued to collect on his account when he went off every month until he died. I collected his dues from the bookkeeper. All dues and assessments demanded of him on this policy during his absence were paid. I remember the time Mr. Ormsby came to me with reference to offering to pay some special war risk assessment of $37.50. We discussed the question of the requirements on the new W. O. W. policy. I did not know exactly what the requirement was. I do know he offered to pay whatever was due. I knew it was customary to collect the dues any member owed and forward them to the camp. I make regular reports once a month to the Sovereign Clerk, John T. Yates. Mr. Ormsby did talk to me about paying the extra war premium and offered to pay it, and I advised him it was unnecessary. I told him I did not think it was necessary. This policy was the first of this kind, and I was ignorant of its contents. I thought the 10 cents war risk dues was to take care of all our members. I thought the 10 cents would take care of all war risk insurance. I did make that statement. I told Mr. Ormsby or Mr. Todd that it was not necessary to pay the $37.50, as Hyman was in the noncombative service. I did not think he had to pay the war risk. Every demand made by the lodge was paid, and I collected the 10 cents extra during his life. I remitted this extra 10 cents. It is a fact that Hyman B. Todd instructed me before he left to continue to keep his insurance in force. He left money both at the bank and at the store for the purpose of keeping his insurance in force, and whatever amount that would be due I agreed to collect. I was a representative of the Sovereign Camp for the purpose of collecting locally."

From this testimony it is evident that Mr. Findley was the agent of the Sovereign Camp in collecting the dues and assessments due the Sovereign Camp by any member of his local camp, and that it was Mr. Findley's duty to remit those collections to the Clerk of the Sovereign Camp once a month. The statement, that "I was a representative of the Sovereign Camp for the purpose of collecting locally," could not mean that he col-

lected only local dues, for the facts showed, beyond the shadow of a doubt, that he collected dues and assessments due the Sovereign Camp. That statement is certainly some evidence in support of the finding of the lower court, and surely Mr. Findley's statement to the effect that the "Sovereign Camp requires the local camps to collect assessments from various members and remit to the Sovereign Camp once a month, and that the clerk of the local camp is really the agent of the Sovereign Camp in that way," strongly supports the findings of the lower court. In addition to this, Mr. Findley further testified:

"I knew it was customary to collect the dues any member owed and forward them to the head camp. I make regular reports once a month to the Sovereign Clerk, John T. Yates." .

This statement alone is sufficient evidence to sustain the findings of the lower court. It is true that Mr. Findley further testified that:

"I never had authority to collect war risk for the Sovereign Camp. I thought that 10 cents would take care of all war risk insurance. I did make that statement."

The lower court heard the testimony, and was in a better position to determine the facts than we are, and, as Mr. Findley's testimony tended to show that he had authority to collect all dues and assessments that were due or payable by members of his camp, we think the judge was justified in believing Mr. Findley's first statements, and in determining from his testimony that the latter had express authority from Mr. Yates, the Clerk of the Sovereign Camp, to collect the amount that Mr. Todd should have paid when he entered the army.

In addition to the above testimony, there is a direct conflict between the second and fifth conditions that were attached to and made a part of the beneficiary certificate issued to Mr. Todd. According to the fifth condition, copied in full above, it is provided that Mr. Todd should pay $37.50 per $1,000 annually in advance to the Sovereign Clerk of the Woodmen of the World. The second condition is as follows:

"If the entrance fees, dues and Sovereign Camp fund assessments are not paid by the person named in this certificate to the clerk of his camp as required by the constitution and the laws of this society, which are now in force or which hereafter may be adopted, this certificate shall be null and void."

In the second condition he is informed that if he does not pay all "Sovereign Camp fund assessments to the clerk of his camp his certificate shall be null and void," and by the fifth condition he is commanded to pay one of these Sovereign Camp assessments to the clerk of the Sovereign Camp. Several times in the brief of the appellant the assessments that should have been paid by Mr. Todd after he entered the army are designated as "assessments," and it would be absurd to contend that the assessments that were specified in the fifth condition of the policy are not "Sovereign Camp fund assessments." In fact, in this condition the war premiums are designated as "war assessments," for it is provided that, "should any member who has entered the service of the United States army or navy pay the additional war risk of $37.50 per $1,000 and die in the United States without having served outside the boundaries of the United States, the total amount paid by him as war assessments shall be refunded to his beneficiary." As every penny of these premiums went to the Sovereign Camp they were clearly "Sovereign Camp fund assessments." It cannot be contended, with any show of reason, that there is no conflict between conditions Nos. 2 and 5 on the ground that condition No. 2 applies only to dues and assessments "required by the constitution and the laws of this society," as condition No. 5 is a part of the forty-third law of the corporation (statement of facts, pp. 26, 27, and 28). In defendant's first supplemental answer the defendant alleges that "the payment of said $37.50 war risk assessment" was "particularly set forth in the by-laws of said society." If condition No. 2 applied only to the dues and assessments set forth in the by-laws and the extra war risk premium of $37.50 a thousand was not provided for in the by-laws of the corporation, but only on the back of the policy, there would be no conflict between these two conditions. However, as a matter of fact the fifth condition was a part of the forty-third by-law of the corporation. Evidently, therefore, there is clearly a conflict between these two provisions. The appellant's brief indicates that it realizes that the by-laws are made a part of the policy, but yet it asks this court to enforce strictly one by-law that happens to be printed on the back of the policy and ignore the other by-laws of the corporation. The second condition was some evidence in favor of the holding of the trial court. We therefore hold that Mr. Todd had the right to pay or tender the amount due after he entered the army to Mr. Findley.

Mr. Findley testified that:

"They (local clerks) have charge of the assessments, collection of the assessments from the members of the local camps."

The lower court could have concluded from this testimony that Mr. Findley had authority from the head officers of the corporation to collect the extra war assessments. In Underwood v. Security Life & Annuity Co., 108 Tex. 387, 194 S. W. 587, Judge Yantis said:

"This court, speaking through the late Chief Justice Brown, in the case of Wininger v. Fort Worth & D. C. Ry. Co., 105 Tex. 56, 143 S. W. 1150, announced the correct rule when testing

the probative force of the evidence when it said, 'If, discarding all adverse evidence and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff,' then there was evidence to support their verdict. The same rule was announced by this court in the case of Cartwright v. Canode, 106 Tex. 507, 171 S. W. 696. Now, in this case, credit should be given to all evidence favorable to the plaintiff in error, and every legitimate conclusion should be indulged favorable to her which might have been drawn from the facts proved, and when following this rule we think the previous course by the insurance company in waiving the forfeiture in the two previous instances mentioned was a circumstance which the court, sitting as a jury, had the legitimate right to consider in determining the intention of the insurance company when it wrote the letter of July 11, 1907. Equitable Life Assurance Association of the United States v. Ellis, 105 Tex. 526, 147 S. W. 1152, 152 S. W. 625."

It may be true that some of Mr. Findley's statements, quoted above, are conclusions, but no objection was made to them by the appellants' attorneys, and they are certainly some evidence that the lower court had a right to consider in determining the facts in this case, and they are surely some evidence that this court may consider in determining whether there is any evidence to support the findings of the trial judge. In fact, there is not a bill of exception in the entire record in this case.

It is well settled in Texas that the clerk of a local camp of a foreign corporation in collecting the dues that are payable to the head camp is the agent of the Sovereign Camp, even though the by-laws may provide that in collecting these dues the clerk of the local camp is the agent of the members of the local camp. The reason for this is self-evident. The by-laws cannot make black white by so declaring. This point was settled once for all in Texas in an opinion written by the Chief Justice of this court while he was a member of the Commission of Appeals. Calhoun v. The Maccabees (Tex. Com. App.) 241 S. W. 102. See, also, Sovereign Camps, W. O. W., v. Putnam (Tex. Civ. App.) 206 S. W. 970; Sovereign Camps, W. O. W., v. Miller (Tex. Civ. App.) 220 S. W. 635. The same question was considered in detail by the Supreme Court of the United States in Supreme Lodge Knights of Pythias v. Withers, 177 U. S. 260, 20 S. Ct. 611, 44 L. Ed. 762. In this case Justice Brown said:

"The position of the secretary must be determined by his actual power and authority, and not by the name which the defendant chooses to give him. To invest him with the duties of an agent, and to deny his agency, is a mere juggling with words. Defendant cannot thus play fast and loose with its own subordinates. * * *

"It could not thus clothe the secretaries of the sections with the powers of agents by authorizing them to receive monthly payments and instructing them to account for and remit them to the Supreme Lodge at Chicago, and in the same breath deny that they were agents at all. The very definition of an agent, given by Bouvier, as 'one who undertakes to transact some business, or manage some affair, for another, by the authority and on account of the latter, and to render an account of it,' presupposes that the acts done by the agent shall be done in the interest of the principal, and that he shall receive his instructions from him. In this case the agent received his instructions from the Supreme Lodge, and his actions were, at least, as much for the convenience of the lodge as for that of the insured. If the Supreme Lodge intrusted Chadwick with a certain authority, it stands in no position to deny that he was its agent within the scope of that authority. * * *

"In some jurisdictions it is held to be practically void and of no effect; in others, it is looked upon as a species of wild animal, lying in wait and ready to spring upon the unwary policy holder, and in all, it is eyed with suspicion and construed with great strictness. We think it should not be given effect when manifestly contrary to the facts of the case, or opposed to the interests of justice. Wherever the agency clause is inconsistent with the other clauses of the policy, conferring power and authority upon the agent, he is treated as the agent of the company rather than of the policy holder."

In Sovereign Camps, W. O. W., v. Putnam (Tex. Civ. App.) 206 S. W. 970, Justice Chilton said:

"There can be no question that the clerk of the local camp is the duly authorized agent of the Sovereign Camp for the collection of any and all dues and assessments chargeable to any member."

In Supreme Lodge, K. of H., v. Davis, 26 Colo. 252, 58 P. 595, it is stated:

"In a mutual benevolent order composed of a Supreme Lodge and subordinate lodges, an officer of a subordinate lodge charged with the duty of notifying the members of assessments made by the Supreme Lodge for the purpose of paying insurance certificates of deceased members, and of collecting and forwarding to the Supreme Lodge such assessments, is an agent of the Supreme Lodge, notwithstanding a rule or by-law of the order recites that such officer in collecting and forwarding assessments shall be the agent of the members of the subordinate lodge, and the Supreme Lodge is charged with all knowledge possessed by the agent in making the collection."

To the same effect are the following authorities: Order of Columbus v. Fuqua (Tex. Civ. App.) 60 S. W. 1020; High Court I. O. of F. v. Schweitzer, 171 Ill. 325, 49 N. E. 506; Coverdale v. Royal Arcanum, 193 Ill. 91, 61 N. E. 915; Supreme Council C. B. L. v. Boyle, 10 Ind. App. 301, 37 N. E. 1105; Dromgold v. Royal N. of A., 261 Ill. 60, 103 N. E. 584; Love v. Modern W. O. A., 259 Ill. 102, 102 N. E. 183; 6 A. L. R. 531; Knights of

Maccabees v. Pelton, 21 Colo. App. 185, 121 P. 949; Godwin v. National Council, 166 Mo. App. 289, 148 S. W. 980; Patton v. W. of W., 65 Or. 33, 131 P. 521.

The local camps of the W. O. W. are integral parts of the Nebraska corporation. These local camps are not separate or subsidiary corporations, but are parts and parcels of the one corporation; in fact they are the corporation. Therefore, even the agents of the local camps are agents of the corporation. Of course, their authority may be circumscribed. But no court should hold that merely because they are elected by the members of the local camps they are not agents of the Sovereign corporation. Surely an agent of a part of a corporation is an agent of the corporation. It is common knowledge that most of the business of fraternal orders is actually transacted by the clerks of the local camps. This court takes judicial knowledge of what is generally known. The members of the local camps know that the secretaries of the local camps transact most of the business of the corporation, and are conscious of the fact that the head officers of the corporation are little more than rubber stamps. As the business of these corporations is actually conducted, slight evidence only should be required to prove that the clerks of the local camps are invested with authority to collect all dues and assessments whether these dues go to pay the expenses of the local camps or to defray the general expenses of the corporation. The facts in this case show conclusively that Mr. Findley collected all the dues that were kept by the local camp; the regular monthly dues that were payable to the Sovereign Camps and the "special war assessment" of 10 cents a month from each member. It was shown that a by-law became effective on October 1, 1917, to the effect that every member should pay 10 cents a month as an extra war assessment to take care of the added risk of those already insured who entered the army or navy. In other words, Mr. Findley admitted that he was authorized to collect dues and assessments payable by the members of his camp, whether the amount was held by the local camp or sent to the Sovereign officers, and at least one of the extra war assessments. In view of this fact, no court should require more than slight testimony to show that he was also authorized to collect the second war premium of $37.50 per $1,000. We therefore hold that, in view of the above testimony, the lower court was justified in holding that Mr. Findley had authority to collect the war premium that was tendered to him by the authorized agent of Mr. Todd.

According to the fifth condition of the policy the assured had 30 days after entering the army and navy in which "to notify the Sovereign Clerk at the home office of the society, Omaha, Neb., * * * and pay in ad-

vance to the Sovereign Clerk the sum of $37.-50 per one thousand dollars." It is evident that this condition does not provide that the additional war premium should be paid at "Omaha, Neb." It merely provides that the notice should be sent "to Omaha, Neb.," and that the premium should be paid "to the Sovereign Clerk." Nor does the condition provide that the premium should be paid in person to the Sovereign Clerk, nor does it prohibit payment to his agent. In view of the way the appellant actually conducted its business, and especially as Mr. Findley collected all other dues, including those that were forwarded to the "Sovereign Clerk," the only reasonable construction of the above provision is that the extra war premium of $37.-50 should be paid to the "Sovereign Clerk" in the usual and customary manner; that is, by paying it to the clerk of the local camp, and he remit the amount to the "Sovereign Clerk." If the company intends to force the assured to pay the extra premium to the Sovereign Clerk at Omaha, Neb., the latter phrase would have been repeated after the word "Clerk," in the phrase "and pay in advance to the Sovereign Clerk." We therefore hold that by the very terms of the policy Mr. Todd had the right to pay the extra war premium to Mr. Findley and notify the latter that he had entered the service of the United States army.

Appellant contended that the officers of a local camp cannot "waive" any of the provisions of the policy, since article 4847, Revised Statutes of Texas 1911, provides that the officers of subordinate bodies of fraternal associations shall have no power "to waive any of the provisions of the laws and constitution of the association." The above case of Calhoun v. The Maccabees (Tex. Com. App.) 241 S. W. 102, answers this contention. Even if we admit that this is a valid statute, it has no application to the power of members of the local camps in their capacity as agents of the Sovereign Camp. We have already seen that Mr. Findley was an agent of the Sovereign Camp in collecting the dues payable to that camp. It is therefore evident that this statute has no application to him in that capacity, as it merely provides "that no subordinate body, or any of its officers or members, shall have the power or authority to waive any of the provisions of the laws and constitution of the association." It is clear that this article applies only to the acts of the agents, members, and officers of the local camps as such, and not to their acts in the capacity of officers or agents of the Sovereign Camp. Baker v. Fort Worth Mut. Benev. Ass'n (Tex. Com. App.) 280 S. W. 165; Wirtz v. W. O. W., 114 Tex. 471, 268 S. W. 438.

The appellant also contends that no officer or agent of the Sovereign Camp had power to waive any of the provisions of the policy, because the following provision is a part of the policy and provides that:

"No camp nor officer thereof, nor any officer, employee, or agent of the Sovereign Camp has authority to waive any of the conditions of this beneficiary certificate or of the constitution and laws of this society."

As a corporation acts only vicariously, this provision of the policy is null and void. If an individual inserts in his contract a provision that he agrees not to change it in any respect, his capacity, privilege, and right subsequently to change the contract is not impaired. A corporation acts only by and through agents. It cannot act in person. Therefore, if the corporation has no directors, but acts only by and through officers and agents, a provision in its contracts that no officer or agent can change or "waive" any of the conditions or provisions of the contract is a nullity. This proposition of law has been settled in Texas for many years. In Texas even if the provision is that "no officer or agent can waive the provision except by a written indorsement on the policy, it is not binding on the officers of the corporation, and may be changed by parol.

In Lamberton v. Connecticut Fire Insurance Co., 39 Minn. 131, 39 N. W. 77, 1 L. R. A. 222, it is said:

"As a corporation can only act through such agencies, the substance of the provision under consideration is that the company shall not be held to have waived any of the terms or conditions of the policy, unless its waiver be expressed by a written indorsement on the policy. * * * A contracting party cannot so tie his own hands, so restrict his own legal capacity for future action, that he has not the power, even with the assent of the other party, to bind or obligate himself by his further action or agreement contrary to the terms of the written contract. Westchester Fire Ins. Co. v. Earle, 33 Mich. 143. This is self-evident. * * * If it is effectual at all as a limitation of the power of future action, it limits the power of every agent, officer, and representative of the company, and hence, practically, that of the corporation. * * * If it applies to any agent or officer, it does to all; and if such a stipulation is not effectual to limit the legal capacity of the corporation as to its future action, it does not limit its capacity to act by its agents."

In the above case the Minnesota court cites with approval the case of Morrison v. Insurance Co., 69 Tex. 353, 6 S. W. 605, 5 Am. St. Rep. 63. On pages 363 and 364 (6 S. W. 609) of this case the Texas Supreme Court said:

"If the policy limited the power of the agent it imposed no limitations on the power of the company itself, and, as said by the Supreme Court of Michigan in considering a provision in a policy similar to those found in the policy before us: 'The condition literally applied would prevent any unendorsed consent by the company itself, by instruction of its board, or by act of its officers, as effectually as by any one else. And the case seems to settle down to the simple question whether a person who has agreed that he will only contract by writing in a certain way precludes himself from making a

parol bargain to change it. The answer is manifest. A written bargain is of no higher legal degree than a parol one. Either may vary or discharge the other, and there can be no more force in an agreement in writing not to agree by parol than in a parol agreement not to agree in writing. Every such agreement is ended by the new one which contradicts it.' Insurance Co. v. Earle, 33 Mich. 153; [American Cent.] Insurance Co. v. McCrea, 8 Lea [Tenn.] 524 [41 Am. Rep. 647]."

In Wagner v. Insurance Co., 92 Tex. 555, 50 S. W. 572, it is said:

"It is claimed by the defendant in error that the policy itself prohibited any agent of the company to waive any of its conditions except it be done in writing. To this position our Supreme Court has made a clear and distinct answer in the case of Morrison v. Insurance Co., 69 Tex. 353 [6 S. W. 605, 6 Am. St. Rep. 63] in which it is held that an agent who has the power to make the contract of insurance, to issue the policy, and, in fact, exercise the highest authority which the law confers upon the corporation, stands in the place of the corporation itself, and that, having the authority to contract, he, no more than the corporation, can be bound to place his contract in writing, because it is a limitation upon the exercise of the authority conferred upon him. [Niagara] Insurance Co. v. Lee, 73 Tex. 646 [11 S. W. 1024]. It is not necessary for us to inquire whether these decisions were in accord with the weight of authority when they were made, for we are not inclined to overrule them and change a rule already established, which, in the judgment of the court, is salutary and valuable in protecting the rights of those who deal with insurance companies."

The above rule surely applies to a loosejointed corporation such as the Woodmen of the World, since it does not have a regular board of directors that assists the officers in conducting the business of the corporation. Once in the record in this case it is stated that, in addition to the officers of the corporation, there is an executive committee that has some power to establish rules for the conduct of the business, but it is not shown that this committee is composed of anybody except officers or agents of the corporation. So far as the record discloses, all the business of the corporation is conducted by officers and agents, and there is no regular board of directors. It is therefore unnecessary to discuss those cases that hold that the above provision is binding on the corporation if it merely provides that "no agent or officer can waive" any of the provisions of the policy where the directors of the corporation are active in the conduct of its business. There is no conflict in the authorities where the corporation has no board of directors and all of its business is conducted by its officers and agents, where the policy provides that "no officer or agent" can waive any of the provisions of the policy, as in this case, but there is some conflict outside of Texas, where the provision goes further and states that

the waiver must be written on the policy. Westchester Fire Insurance Co. v. Earle, 33 Mich. 143, 153; Lambertson v. Connecticut Fire Insurance Co., 39 Minn. 129, 39 N. W. 76, 1 L. R. A. 222; Kimball et al. v. Howard Fire Insurance Co., 8 Gray (Mass.) 33; Walsh v. Hartford Fire Insurance Co., 73 N. Y. 5; Gladding v. California Farmers' Mut. Fire Insurance Co., 66 Cal. 6, 4 P. 764; Smith v. Niagara Fire Insurance Co., 60 Vt. 682, 15 A. 353, 1 L. R. A. 216, 6 Am. St. Rep. 144; 6 California Law Review, 203; 12 Columbia Law Review, 134. See, also, Ætna Life Insurance Co. v. Insurance Co., 191 Ind. 554, 133 N. E. 4, 22 A. L. R. 402; Reilly v. Linden, 151 Minn. 1, 186 N. W. 121. See, also, 107 Am. St. Rep. 102; 10 L. R. A. (N. S.) 1064; 13 L. R. A. (N. S.) 839; 51 L. R. A. (N. S.) 261; 38 A. L. R. 636, see notes.

For a decision of this case it is not necessary to decide whether article 4847 of the Revised Statutes of Texas 1911 is so indefinite that the courts will not attempt to enforce it, as we base our decision in this case on the ground that Mr. Findley was agent of the Clerk of the Sovereign Camp in collecting the war premium and receiving notice that Mr. Todd had entered the army. But the writer of this opinion knows of no word used by lawyers that is more indefinite than the term "waiver." Mr. Ewart contends that there is no such doctrine in law. He makes out a strong case in showing that when that term is used by our judges and text-writers they really mean election, estoppel, promissory estoppel, contract, or release. Waiver Distributed by Ewart; 18th Har. L. Rev. 364; 12 Columbia Law Rev. 619; 29 Har. L. Rev. 728. See, contra, 13th Columbia L. Rev. 51. Professor Williston shows that judges and text-writers attribute nine different meanings to the term "waiver." Williston on Contracts, § 679. Certainly there is a difference between "waiver" and "estoppel," although a great many of our courts say that "the basis of waiver is estoppel." It is clear that the usual judicial definition of "waiver" that it is "an intentional relinquishment of a known right" is misleading, for, in the absence of estoppel, promissory estoppel, new valid contract, election, or a release based upon consideration, one cannot surrender one's rights in the absence of consideration. This matter is gone into very carefully by Professor Williston in sections 678 to 698, inclusive, of his text on Contracts, vol. 2. In determining the meaning of the above article our courts should either fix a definite meaning to the term "waiver" or declare the article void because too indefinite. So many different meanings have been given to the term "waiver" by different courts that no one can really determine what the Legislature had in mind when the above article was enacted. Unless a definite meaning is given to the word "waiver," article 4847 of our statute is as indefinite as article 800 of the Penal Code of 1925, prohibiting the driving of an automobile faster than six miles an hour over an obscure railroad crossing, and the Commission of Appeals has recently held that article void because it is too indefinite. International & Great Northern Ry. Co. v. Mallard (Tex. Com. App.) 277 S. W. 1051; G. H. & S. A. Ry. Co. v. Duty (Tex. Com. App.) 277 S. W. 1057; 38 Har. L. Rev. 964; Tozer v. U. S. (C. C.) 52 F. 917; State v. I. & G. N. Ry. Co. (Tex. Civ. App.) 165 S. W. 892; Augustine v. State, 41 Tex. Cr. R. 59, 52 S. W. 77, 96 Am. St. Rep. 765, and other cases cited in note 4, 38 Har. L. Rev. p. 964.

The important words in the fifth condition are "shall die while serving in any branch of the United States army or navy." The Supreme Court of Arkansas in the case of Miller v. Illinois Bankers' Life Insurance Co., 138 Ark. 442, 212 S. W. 310, 7 A. L. R. 378, held that in such a case the beneficiary could not recover the face of the policy even though the death was not one arising out of or the proximate result of military or naval service. But the same court in the cases of Benham v. Insurance Co., 140 Ark. 612, 217 S. W. 463, and Nutt v. Insurance Co., 142 Ark. 29, 218 S. W. 675, held that the beneficiary could recover the face of the policy where the policy provided that the beneficiary could recover only the reserve under the policy if he died "while engaged in military or naval service," unless an additional premium was paid. Other courts have reached the same conclusion. An extended discussion of these cases will be found in 21 Columbia L. Rev. 35 to 55, and 6 Cornell L. Quarterly, 450, 18 Mich. L. Rev. 686, and 7 A. L. R. 382. See, also, Sovereign Camp, W. O. W., v. Akins (Tex. Civ. App.) 219 S. W. 494. Surely "engaged in the military or naval service" and "while serving in any branch of the army or navy" mean one and the same thing, and the writers of the above articles in the Columbia and Cornell Law Reviews contend that in either case the beneficiary should be permitted to recover where death was due to pneumonia, influenza, or any other cause which was not the proximate result of military or naval service, "since there was no increase of hazard, and since the influenza epidemic was prevalent throughout the country." In Benham v. American Central Life Insurance Co., 140 Ark. 612, 217 S. W. 462, the court said:

"The words 'death while engaged in military service in time of war' mean death while doing, performing, or taking part in some military service in time of war; in other words, it must be death caused by performing some duty in the military service. That is to say, in order to exempt the company from liability, the death must have been caused while the insured was doing something connected with the military service, in contradistinction to death while in the service due to causes entirely or wholly unconnected with such service. * * * In the

case at bar the insured died from influenza, and the record shows that this disease was prevalent throughout the United States, and that soldiers and civilians alike contracted it and died from it. The death of the insured, then, was in no sense caused by performing any military service, or in consequence of being engaged in military service."

In Nutt v. Security Life Insurance Co., 142 Ark. 29, 218 S. W. 675, the court said:

"It appears in the agreement of facts that the insured died of influenza on October 12, 1918, in the base hospital at Camp Pike. This disease was a disease common to soldiers and civilians alike, and was not confined to any particular locality; so it is apparent that it was not intended by the clause in question to concede that death resulted to the insured from any active service in the war. * * * The provision is plain and unambiguous. It only exempts the company from liability on the face of the policy from death proximately caused by war activities. * * *"

"While we do not regard the clause now before us for construction as containing any ambiguity, yet an additional reason in support of the conclusion reached upon the interpretation of the clause may be found in the fact that no reduction was provided in the policy of the premium during the period of enlistment. Had it been the intention of appellee insurance company to relieve itself from death resulting from natural or ordinary causes during the period of enlistment, it would certainly have provided for a corresponding reduction in the premium. It is hardly supposable that the same premium of $68.26 per annum would have been exacted to give the insured protection to the extent of the reserve value of the policy when the reserve value [$51.44] was less than the annual premium. The fact that no reduction was made in the premium is indicative of the intent on the part of the company to exempt itself from the payment of the face of the policy under the war exemption provision from death caused by enhanced danger or hazard to life incident to war, and not from death incident to causes for which it imposed and exacted a fixed annual premium."

In Boatwright v. American Life Insurance Co., 191 Iowa, 253, 180 N. W. 321, 11 A. L. R. 1085, the provision of the policy was, "engaged in military or naval service in time of war." The insured died of influenza while in training in Illinois. The facts showed that this disease was prevalent thoughout the United States and was not confined to any particular class of people or locality. The court held the insurance company liable for the face of the policy, although it held that the insured had entered the service when he enlisted and took the prescribed oath. In the opinion it is said:

"He had not at the time been assigned to duty in the navy, and his occupation was not necessarily more hazardous than it was at the time the application for the policy was signed, which was that of a farmer and driver of a dairy wagon. At the time of his death an epidemic of influenza extended over a large part of the United States, and was nearly, if not quite, as common among civilians as among those in training at the naval station referred to, or the various camps throughout the country. That the provision of the policy in question was inserted therein as a protection to the insurer against the extraordinary hazards of war is, of course, obvious. The insured at the time of his death and at all times after he enlisted in the navy was thousands of miles from this zone of actual warfare and many hundred miles from the high seas. He had assumed none of the hazards of naval warfare. In the sense that he had pledged or obligated himself to perform whatever service he might be called upon to perform, and that he was bound to observe the rules and discipline of the navy, he was engaged in the naval service. He had entered the naval service of the United States in time of war. He had not, however, taken part in any of the movements of the navy, had not been present when it was engaged in a conflict with the enemy or other action, but was pursuing a course of instruction preparatory to being assigned to some active duty in the navy."

The same conclusion was reached in the following cases: Gorder v. Lincoln National Life Insurance Co., 46 N. D. 192, 180 N. W. 514, 11 A. L. R. 1080; Redd v. American Central Life Insurance Co., 200 Mo. App. 383, 207 S. W. 74; Carlson v. Insurance Co., 170 Wis. 342, 174 N. W. 896; Myli v. Insurance Co., 43 N. D. 495, 175 N. W. 631, 11 A. L. R. 1097. See contra cases cited in 21 Columbia Law Review, 49, 50.

It is true that in these cases the court emphasized the word "engaged," and "in consequence of such service," and "resulted directly or indirectly therefrom," but it is evident that the above courts that permitted the plaintiff to recover the full face of the policy after he had entered the service of the army or navy without getting a "permit or paying an extra premium" really held the company liable because the court was of the opinion that the extra premium was paid because of the extra hazard due to military service. In 21 Columbia Law Review the writer said:

"What would be the extent of the insurer's liability where the assured has not availed himself of the privileges offered by the insurer and his death is not the result of the war? What would the insurer's liability be where the assured's death was due to natural causes, not at all connected with war, but after he had been exposed to the dangers of war? The cases have not considered the latter problem. Gillies v. Preferred Accident Insurance Co., 110 Misc. Rep. 489, 181 N. Y. S. 550, and Martin v. People's Mutual Life Insurance Co., 145 Ark. 43, 223 S. W. 389, 11 A. L. R. 1111. On the former proposition the cases are about equally divided; the better view, it seems, is that the beneficiary of the assured may recover the full face of the policy. The result thus obtained, even though some violence is done to the meaning of the words of the policy is sound; because the acceptance of the normal premium is only consistent with continuance of insurance against the ordinary risks of death, and because it is in

accord with sound social policy and the understanding of the insurance world. * * *

"In the leading cases denying recovery where the assured died of pneumonia in a training camp in the United States (Miller v. Illinois Banker's Life Ass'n [1919] 138 Ark. 442, 212 S. W. 310, 7 A. L. R. 378; Reid v. American Nat. Assur. Co. [1920] 204 Mo. App. 643, 218 S. W. 957; Ruddock v. Detroit Life Ins. Co. [1920] 209 Mich. 638, 177 N. W. 242), on board a transport (Mattox v. New England Mutual Life Insurance Co. [1920] 25 Ga. App. 311, 103 S. E. 180), or in France (Sandstedt v. American Cent. Life Ins. Co. [1920] 109 Wash. 338, 186 P. 1069; Slaughter v. Protective League Life Insurance Co. [1920] 205 Mo. App. 352, 223 S. W. 819), the courts interpreting the clauses 'while in the service' and 'while engaged in naval or military service in time of war, or in consequence of such service,' placed their decisions on the questionable ground that status was the intended basis for the assumption of any risk. It seems that the courts allowing recovery where the interpretation of similar clauses was involved have more accurately given effect to the probable intention of the insurer as evidence by the understanding of the insurance world.

"So, if the assured died of influenza or pneumonia or other diseases, and those diseases were pandemic, and the percentage of deaths in the service from those causes was no greater than in civil life, surely the insurer should not be permitted to escape liability on any theory of increased hazard. * * *

"The only condition limiting liability, where there is such a limitation, should be the death of the assured as a result of an increase of hazard due to the war. * * *

"The war clause was not intended to have the apparent meaning, because the acceptance of the normal premium is only consistent with the continuance of insurance against the ordinary risks of death."

In 6 Cornell Law Quarterly, after commenting on Boatwright v. Insurance Co., 191 Iowa, 253, 180 N. W. 321, 11 A. L. R. 1085, and Gorder v. Insurance Co., 46 N. D. 192, 180 N. W. 514, 11 A. L. R. 1080, the writer says:

"On principle it would seem that the majority rule in the instant cases is logical, equitable and in accordance with the rules governing insurance cases. That the provisions of the policies in question were inserted as protection against the extraordinary hazards of war is obvious—additionally evidenced by the requirement that extra premiums be paid for such risks. Therefore, where the wording of the provision permits such construction, recovery should not be denied where the death was not one arising out of, or the proximate result of, the military or naval service."

What was said by Mr. Justice Harlan in Liverpool & London Insurance Co. v. Kearney, 180 U. S. 132, 21 S. Ct. 326, 45 L. Ed. 460, is particularly applicable to the instant case:

"A literal interpretation of the contracts of insurance might sustain a contrary view, but the law does not require such an interpretation. In so holding the court does not make for the parties a contract which they did not make for themselves. It only interprets the contract so as to do no violence to the words used and yet to meet the ends of justice."

All courts are conscious of the fact that policies of insurance evidence contracts of a peculiar nature. In 35 Yale Law Journal, 206, it is said:

"Courts have often mentioned the peculiar circumstances governing the formation of the insurance contract and reference to them seems unnecessary. The contract has been called one of 'adhesion' (33 Harv. L. Rev. 198, 222), as the insured merely 'adheres' to it with little choice as to its terms. Unfamiliar with the elements which determine the quality of a risk, the average applicant for insurance customarily and reasonably relies on the agent, who he knows is familiar with the business, to issue him a policy fully covering the risk against which he wishes protection. The policy he receives is a complicated, readymade mechanism composed of innumerable finely printed clauses couched in unfamiliar legal language, the meaning and legal effects of which he would have great difficulty in understanding if he should read them. The common practice, is, moreover, not to read the policy, and a growing number of courts, recognizing that the custom of the community is one of the circumstances determining a standard of due care, have held this practice not to be negligence. Accordingly policies have been reformed for mutual mistake, although the mistake must have become apparent to the insured if he had examined the contract. Merchants' & Manufacturers' Alliance v. Hansen (Tex. Civ. App.) 258 S. W. 257. Similarly, in suits on the policy, courts have not let failure so to examine prevent recovery, relying on the ground of waiver or estoppel. Central States Fire Insurance Co. v. Wright (Tex. Civ. App.) 273 S. W. 629. Thus a tendency is marked to relax the strict rules of accountability to which a contracting party is ordinarily held.

"In the everyday language of the streets, a man 'buys' insurance. This terminology, upon examination, does not seem so metaphorical as at first it may appear. The policy, it has been pointed out, is in effect a highly complex machine, as intricate and as incomprehensible in its details to the layman as an automobile. He looks upon the two in very much the same way. The one is a vehicle of physical transportation, the other of financial protection. Each is a commodity sold him by the agent of the producer. If his automobile breaks down and fails, in consequence of defective mechanism, to afford efficient transportation, he can hold the manufacturer responsible on an implied warranty of fitness. If his insurance policy breaks down and fails to cover the risk for which it was secured, why should he not be able to hold the insurer responsible on a similar warranty? This analogy apparently has never been expressed by any court, although the opinions of several would seem to suggest it. At least it seems to rationalize more plausibly the result which many courts are reaching than the 'false pretenses' and 'conclusive presumptions' which they have expressly mentioned. The implied warranty of reasonable fitness for an intended purpose has not been confined to the law of

sales. It has been applied to bailments of chattels for hire, to the leasing of furnished dwellings for short terms, and in at least one state to leases in general. Its extension to insurance law does not seem strained in view of the results already being reached by the courts."

In this case the fourth condition of the policy provides, "If the member holding this certificate shall engage in war except in the defense of America this certificate shall be null and void," and in the fifth condition it is provided that if he "shall die while serving in any branch of the United States army or navy" the beneficiary shall recover a very small amount unless an additional premium is paid. It also provides that if the additional premium of $37.50 a thousand is paid and the member "dies in the United States without having served outside the boundaries of the United States, the total amount paid by him as war assessments shall be refunded to his beneficiary." However, it is not provided that if he serves in the army or navy outside of the boundaries of the United States and his health is not impaired by such service the extra assessment shall be returned to him or his beneficiary. It seems clear from these provisions of the policy that the extra war assessments were imposed for the extra hazard due to service in the army or navy outside of the boundaries of the United States. In 21 Columbia Law Review it is shown that the death rate among our soldiers and sailors during the World War amounted to but little over 6 per cent. above the normal death rate. In this case the insured paid all of his regular assessments each month, and also an extra war assessment of 10 cents a month. These premiums were paid for insurance in case of death not the direct result of military service. The above cases hold that the burden is on the insurance company to show that the assured's death was a result of increased hazard due to the war. The record in this case shows that the deceased was a member of the quartermaster's department of the army, and died in France, but, so far, as the record discloses, he may have died of influenza 150 miles back of the front lines and may not have been exposed to any dangers of warfare. So far as we know his health may have been materially improved by the ocean voyage and his services in the quartermaster's department of the army after he reached France.

The record also shows that the insured's regular assessments amounted to about $18 a thousand. According to the fifth condition of the policy, the assured must pay $37.50 a thousand in case he enters the service of the army or navy and dies outside of the boundaries of the United States. This extremely high premium must have been established because the officers of the W. O. W. deemed it extremely dangerous for our American soldiers to "engage in war" with the enemy. The amount of the premium was determined by estimating how many of the W. O. W. members would die by reason of added dangers incident to actual military service. The above exempting clause "is broad enough, if given a literal meaning to preclude from recovery the beneficiary of any one who has taken the oath of a soldier or sailor, whether he is guarding a swivel chair in Washington or 'going over the top' in France when he meets his death." 21 Columbia Law Review, p. 35. The regular assessment was the price or consideration paid for the promise to pay the face of the policy in case the insured died from normal causes, or a cause not resulting from the added danger of military service, and the extra war premium of $37.50 a thousand was the consideration for the chance of death resulting from a cause peculiar to military service. There is no intimation anywhere in this record that a higher rate than $37.50 a thousand was established for members who entered the military service and their regular assessments subtracted from the higher rate. By the terms of the fifth condition, as construed by the appellant, the insured must determine within 30 days after he enters the service of the army whether he elects to pay the extra high war premium, even though at that time he may be under the impression that he will never be called upon to perform foreign service, and if he elects to pay it, but never serves outside the borders of the United States, he must die before the premium is paid to the beneficiary. This may be 30 or 40 years later. And if he is ever exposed to foreign service the premium is not returned, though, clearly, the risk assumed was death, and not exposure to death, from foreign service. "Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." The Kronprinzessin Cecilie, 244 U. S. 12, 37 S. Ct. 490, 61 L. Ed. 960. These provisions show how extremely severe and unjust the fifth condition is, and justify our construing it strictly against the insurance corporation. Dumphy v. Commercial Union Assurance Co., 107 Tex. 107, 174 S. W. 814; Baker v. Liverpool Insurance Co. (Tex. Civ. App.) 275 S. W. 316.

In section 43 of the constitution and by-laws it is provided:

"Persons engaged in the following occupations, to wit:

"(a) Enlisted men in the army and navy during war may be admitted to membership, but their certificates shall not exceed $2,000 each, and their rate of assessment shall be $3.60 per annum for each $1,000 in addition to the regular rate while so engaged in such hazardous occupations.

"(b) If a member engages in any of the occupations of business mentioned in this section he shall within thirty days notify the clerk of his camp of such change of occupation, and while so engaged in such occupation shall pay on each monthly installment 30 cents for each $1,000 in addition to the regular rate."

In the fifth condition it is provided that one "serving in the army or navy" should within 30 days after entering the service notify the Sovereign Clerk at the home office of the Society, Omaha, Neb. It is not clear that section 43, in providing for the giving of notice of entry into the army, applies only to men already in the army, for the language of the section in part is, "if a member engages in any of the occupations or business mentioned in this section, etc." There is, therefore, a conflict between these two provisions, and in such cases the doubt is always resolved in favor of the assured. Under this construction Mr. Todd was justified in notifying the clerk of the local camp that he had entered the army of the United States.

In fact, there are so many inconsistencies in this policy, due to the fact that the charter of the corporation, the by-laws and constitution, together with all the amendments thereto, are made a part of the policy, and the by-laws and constitution have been amended and added to so often, with little attention being paid to the contradictions between the old and new provisions, that the policy, when spread upon the table, looks like a crazy quilt, and when read aloud sounds like a jazz melody. We believe in the freedom of contracts, but "the law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman." Wood v. Duff-Gordon, 222 N. Y. 88, 118 N. E. 214. And where an insurance company prepares as indefinite a contract as the one involved in this case—so vague that an astute lawyer could not be certain as to its meaning—it should not be heard to complain if the courts prevent it from perpetrating a fraud on its members. No wonder that Mr. Findley in this case, and the secretaries of two other local lodges in the case of Sovereign Camp, W. O. W., v. Jackson (Tex. Civ. App.) 264 S. W. 289, swore that they thought that the extra war assessment of 10 cents a month on all members was all that was due by any of our soldier or sailor boys. No one can read all the provisions of this policy in connection with the facts of this case without concluding that it would be the height of injustice to permit the defendant corporation to escape liability. Mr. Findley swore that this was the first policy that he had ever delivered in which the fifth condition was inserted, and, at that time, he had been delivering and countersigning policies for the defendant corporation ever since 1907. He also swore that he told the agent of Mr. Todd that the 10 cents extra assessment from all members took care of all war risks. This agent insisted twice that Mr. Findley accept the extra war risk provided for in the fifth condition, but as many times Mr. Findley refused because he thought that nothing was due the company, and he even insisted that in case he was mistaken the company would pay the beneficiary the face of the policy less $37.50 a thousand. Before Mr. Todd

left he told Mr. Findley that he would always keep on deposit at the bank and at his father's store sufficient funds with which to pay all premiums due in order to keep "his insurance in full force." Had Mr. Todd been alive when this case was tried he, no doubt, would have sworn that when the policy was delivered to him he was assured that if he kept his regular assessments, including the extra war premium of 10 cents a month fully paid his beneficiary would receive the face of the policy upon his death. Sovereign Camp, W. O. W., v. Richardson, 151 Ark. 231, 236 S. W. 278. No company should ask its agents to deliver policies in which new provisions appear without calling their attention to changes in the policy. Mr. Findley was a member of the Sovereign Camp, but did not know that the executive committee had inserted the fifth condition in the W. O. W. policies until after he had refused to receive the war premium tendered him by Mr. Todd's agent.

In view of all the facts in this case, unless the rules of equity have become so crystallized that courts of equity have ceased to function as they originally did, should not this court grant relief against the forfeiture provided for in "the blind condition" of this policy, for the same reason that courts of equity many years ago gave relief to the mortgagor in the common-law mortgage, and stayed the hands of the trickster who misread the contract to the blind obligor? 33 Mich. Law Review, 151. It would be more just and equitable for a court to enforce the contract against the blind maker in the above case than for this court in the instant case to say to these plaintiffs, "take the morsel of bread tendered you by the defendant, though your brave boy died firmly believing from the conduct of his W. O. W. brothers that you would be tendered a full loaf by his brothers" in the Woodmen of the World—a benevolent fraternal order. A forfeiture may be expressed in a condition as well as in a covenant, and "relief against the effect of penalties should depend as little as possible upon form." Williston on Contracts, § 793. Equity courts are established to do justice between litigants, and laymen would have more respect for our courts if our equity judges always kept fresh in mind what Dean Pound said in the Columbia Law Review:

"Ihering has told us that we must fight for our law. No less must we fight for equity. Law must be tempered with equity, even as justice with mercy. And if, as some assert, mercy is part of justice, we may say equally that equity is part of law, in the sense that it is necessary to the working of any legal system. We who have the shaping of the law in our hands in this era of the decadence of equity have no less responsibilities than those who pleaded and judged in its founding, its development, and its crystallization." 5 Columbia Law Review, 35.

This court, in the case of Soverign Camp, W. O. W., v. Jackson, 264 S. W. 289, reversed

the decision of the lower court in order to afford the appellee an opportunity to develop more fully her testimony on the question of waiver. It is true that in that case this court seemed to overlook the holding of the Commission of Appeals in the case of Calhoun v. Maccabees, 241 S. W. 102, in which the Commission of Appeals held that the local clerk may act at one and the same time in a dual capacity, and when acting as the agent of the Sovereign Camp could waive provisions of the policy. This court in that case did not seem to realize that a provision in a policy providing that "no officer or agent could waive any of the provisions of the policy" is a nullity. The decision in that case is bottomed mainly on the proposition that article 4847 of the Revised Statutes of Texas 1911 prevented any of the officers or members of the local camps from waiving any of the provisions of the policy. The Jackson Case is clearly distinguishable from the case now before the court. In that case the lower court did not file any conclusions of fact or law, while in this case the lower court held that the clerk of the local camp had authority to receive assessments due the Sovereign Camp, and was agent of the Sovereign Clerk in receiving notice that the insured had enlisted in the army, and we have shown that there was sufficient testimony to support those findings. In the Jackson Case the conflict between the different provisions of the policy was not noticed, nor did the court consider the conflict in the authorities as to the meaning of "engaged in the service of the army and navy" or "while serving in the army or navy." In the Jackson Case there was no direct tender of the extra war premium. The court also stated that we joined the Allies and declared war upon Germany in 1918, whereas, as a matter of fact, this court knows judicially that the United States joined the Allies and declared war upon Germany on the 6th day of April, 1917. It is also true that the court in the Jackson Case held that the assured "owed $18.75 additional war risk premium, since his insurance for the first year was only $500." We believe that his latter statement is incorrect, since in that case the assured entered the army some time after the date and delivery of his policy and before the end of the first year, and the policy provided that if the assured died during the second year the beneficiary should receive $750, and $1,000 if he died after the second year. We now hold in such case that if the assured entered the army during the first year of his policy he should pay only the pro rata part of the premium for the balance of the year. This necessarily follows from the fact that in the Jackson Case the policy was for $750 for the second year, but only $500 for the first year. In the case now before the court the policy was for $1,000 the first year and $1,500 the second year. The assured joined the army on the 25th day of March, 1918, and

283 S.W.—43

died November 11, 1918. The policy was dated December 11, 1917. We have carefully examined every case cited in the Jackson Case. The opinions discuss merely the legality of the fifth condition of the W. O. W. policy, and contain no discussion of the many other points involved in this case. Very few of opinions were from courts of last resort.

It is very difficult to ascertain the exact meaning of that part of the fifth condition which provides that the insured shall "pay in advance the sum of $37.50 per one thousand dollars insurance per annum in addition to the regular assessments." Does this provision mean that the insured should pay the pro rata part of the premium due for the balance of the current year of his policy, or that he should begin payment of the added war risk premium at the beginning of the next year of the policy? In other words, should Mr. Todd in the instant case pay the pro rata part of the premium due from the time he entered the army until December 11, 1918, or would he have until the latter date in which to begin the payment of the extra war premium? According to the above provision he must pay this extra premium "in advance." The policy does not provide when the payment should begin, nor is it very definite that he had 30 days after entering the army in which to pay the premium. These matters should have been made very clear by definite provision in the policy. In view of these uncertainties, we hold that the assured had 30 days after he entered the army in which to pay the war premium. This premium, therefore, should have been paid not later than the 25th day of April, 1918. The testimony shows conclusively that it was tendered to Mr. Findley before that time. There are 230 days from April 25th to December 11. The assured should, therefore, have paid $\frac{230}{365}$ of $37.50. This amounts to $23.63. If we followed the Jackson Case on this point we would hold that the assured should have paid $37.50. Clearly that would be incorrect, as, beginning with December 11, 1918, the face of the policy was $1,500. It is evident, therefore, that on that date an additional premium for the added $500 should be paid. Carlson v. Scandia Life Insurance Co., 170 Wis. 342, 174 N. W. 896. According to the weight of authority the premium is payable from the date of the policy rather than from the date of its delivery. Wolford v. National Insurance Co., 114 Kan. 411, 219 P. 263, 32 A. L. R. 1248. By reason of the provision of article 1626 of the Revised Statutes of Texas 1911 this court has express authority to render such judgment as the court below should have rendered. Ft. Terrett Ranch Co. v. Bell (Tex. Civ. App.) 275 S. W. 81. In this case Mr. Findley should have accepted the premium tendered him, and it is but just and right that the plaintiff should pay to the appellant the above sum of $23.63.

I am therefore of the opinion that the judg-

ment of the lower court should be affirmed for the full amount of that judgment, less $23.63, and the cost of this appeal should be taxed against the appellant.

For. the above reasons, I dissent from the majority opinion in this case.